# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

Maya Crosby and Deneen Patton, on
behalf of themselves and all those
similarly situated,

    Plaintiff,

 v.

Stage Stores, Inc.,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 18-cv-00503

Chief Judge Waverly D. Crenshaw, Jr.

Magistrate Judge Alistair Newbern

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR COURT-AUTHORIZED NOTICE PURSUANT TO SECTION 216(b) OF THE FAIR LABOR STANDARDS ACT

**TABLE OF CONTENTS**

PAGE

I.      INTRODUCTION ................................................................................................ 1

II.     PROCEDURAL POSTURE .............................................................................. 2

III.    FACTUAL BACKGROUND .............................................................................. 2

        A.      Stage Operates Over 800 Specialty Department Stores Nationwide .................... 2

        B.      Stage's Time Clock Procedure .............................................................................. 3

        C.      Stage's Corporate Policies Explicitly Require Employees To Record All
                Time Worked And Strictly Prohibit Time-Shaving ............................................. 3

                1.      Stage's Written Policies Require Employees To Record All Hours
                        Worked ...................................................................................................... 3

                2.      Stage Explicitly Prohibits Time-Shaving Or Any Other
                        Falsification Of Time Records .................................................................. 4

                3.      Stage Provides Multiple Avenues for Employees to Report
                        Concerns Regarding Violations of Stage's Timekeeping Policies ........... 6

                4.      Stage's Timekeeping Policies Are Consistently Reiterated In Daily
                        and Weekly Communications Distributed to The Stores .......................... 6

                5.      Stage Further Emphasizes Its Timekeeping Policies In
                        Management Meetings and Trainings ....................................................... 7

        D.      Stage Diligently Investigates And Takes Appropriate Action In The
                Isolated Instances Where Off-The-Clock Work Or Time-Shaving Is
                Reported ............................................................................................................... 7

        E.      Named-Plaintiffs Had Dramatically Different Experiences From Their
                Own Declarants ................................................................................................... 10

                1.      Maya Crosby .......................................................................................... 10

                2.      Deneen Patton ........................................................................................ 12

                3.      The Opt-In Plaintiffs' and other Declarants' Testimony Reveals
                        That Their Experiences Differ In Many Respects From That Of
                        The Named-Plaintiffs .............................................................................. 13

i

F.    Named-Plaintiffs Admit They Had Dramatically Different Experiences From Stage's Declarants ............................................................... 15

IV.   LEGAL ANALYSIS ................................................................................ 17

A.    Plaintiffs Must Make A "Modest Factual Showing" They Are "Similarly Situated" To Members Of The Proposed Collective With Respect To A Common Policy That Violates The FLSA .......................................... 17

B.    Plaintiffs Identify No Common Unlawful Policy Or Practice That Allegedly Affects All Members Of the Proposed Collective ............................. 18

1.    Stage's Written Policies Unequivocally Prohibit Time-Shaving And Off-The-Clock Work ....................................................... 18

2.    Plaintiffs' Have Not Identified Any De Facto Policy Common To Them And The Putative Collective That Violates The FLSA ................ 19

3.    A Labor Budget Alone Is Not An Unlawful Policy Or Practice ............. 22

4.    The Cases Upon Which Plaintiffs' Rely Are Readily Distinguishable ........................................................................ 24

C.    The Conflict Between Plaintiff Crosby And Members Of The Putative Collective Defeats Conditional Certification ....................................... 26

V.    PLAINTIFFS' PROPOSED NOTICE PROTOCOLS ARE OBJECTIONABLE AND PREMATURE ................................................................................ 27

A.    Notice Should Only Issue To Individuals Going Back Three Years Back From The Date Of the Court's Order ................................................. 27

B.    Notice To Potential Class Members Should Be Handled By A Third-Party Administrator ............................................................................ 28

C.    Plaintiffs' Requests For A Reminder Notice And A Notice With Paychecks Should Be Denied .......................................................... 29

VI.   CONCLUSION ..................................................................................... 30

Case 3:18-cv-00503   Document 42   Filed 10/10/18   Page 3 of 36 PageID #: 788

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ahmed v. T.J. Maxx Corp.*,
10-CV-3609 ADS ETB, 2013 WL 2649544 (E.D.N.Y. Jun. 8, 2013) ...................................22

*Braun v. Superior Indus. Int'l, Inc.*,
09-2560-JWL, 2010 WL 3879498 (D. Kan. Sept. 28, 2010)...................................................23

*Caballero v. Kelly Servs., Inc.*,
CV H-14-1828, 2015 WL 12732863 (S.D. Tex. Oct. 5, 2015) .............................................23

*Chalker v. Burlington Coat Factory of Florida, LLC*,
8:12–cv–2755–T–23TBM, 2013 WL 5954783 (M.D. Fla. Nov. 7, 2013) ............................23

*Ellerd v. County of Los Angeles*,
CV 08-4289 CAS FFMX, 2009 WL 982077, at *5 (C.D. Cal. Apr. 9, 2009).......................27

*Epic Systems Corp. v. Lewis*,
138 S.Ct. 1612 (May 21, 2018)............................................................................................29

*Fenley v. Wood Grp. Mustang, Inc.*,
170 F. Supp. 3d 1063 (S.D. Ohio) .......................................................................................29

*Gaffers v. Sitel Worldwide Corp.*,
2016 WL 3137726 (M.D. Tenn. June 6, 2016)............................................................. *passim*

*Goodrich v. Covelli Famly Ltd. Partnership*,
8:11–cv–1715–T–33TBM, 2012 WL 1081473 (M.D. Fla. March 30, 2012)........................24

*Graves v. State of Colorado*,
31 Fed. R. Serv. 2d 1480 (D. Colo. 1980) ...........................................................................27

*Gunn v. NPC Int'l, Inc.*,
No. 13-1035, 2016 WL 7223466 (W.D. Tenn. Dec. 13, 2016) .............................................29

*Harper v. Lovett's Buffet, Inc.*,
185 F.R.D. 358 (M.D. Ala. 1999)..........................................................................................20

*See Hoffmann-La Roche Inc. v. Sperling*,
493 U.S. 165 (1989).........................................................................................................28, 30

*Holmes v. Kelly Services USA, LLC*,
16-CV-13164, 2017 WL 3381415 (E.D. Mich. Aug. 7, 2017)..............................................23

*Kutzback v. LMS Intellibound, LLC*,
2:13–cv–2767–JTF–cgc, 2014 WL 7187006 (W.D. Tenn. Dec. 16, 2014)............................27

*Kutzback v. LMS Intellibound, LLC*,
301 F. Supp. 3d 807 (W.D. Tenn. 2018)..................................................................................25

*In re Lease Oil Antitrust Litig*,
186 F.R.D. 403 (S.D. Tex. 1999)............................................................................................28

*Masri v. Wakefield*,
106 F.R.D. 322 (D. Colo. 1984) .............................................................................................27

*Medley v. Southern Health Partners, Inc.*,
1:17-cv-00003, 2017 WL 3485641 (M.D. Tenn. Aug. 8, 2017)............................................20

*Monroe v. FTS USA, LLC*,
860 F.3d 389 (6th Cir. 2017), *cert. denied*, 138 S.Ct. 980 (2018)........................................18

*O'Brien v. Ed Donnelly Enters.*,
575 F.3d 567 (6th Cir. 2009) .................................................................................................18

*Pacheco v. Boar's Head Provisions Co., Inc.*,
671 F. Supp. 2d 957 (W.D. Mich. 2009) ...............................................................................20

*Peer v. Grayco Mgt. LLC*,
3:16-CV-01578, 2017 WL 2403269 (M.D. Tenn. June 2, 2017) ........................18, 20, 21, 22

*Penley v. NPC Int'l, Inc.*,
2016 WL 7228901 (W.D. Tenn. Dec. 13, 2016) ...................................................................24

*Phipps v. Chariots of Hire, Inc.*,
No. 3:17-CV-97-TAV-HBG, 2017 WL 4228028 (E.D. Tenn. Aug. 29, 2017).....................29

*Redmond v. NPC International, Inc.*,
13-1037, 2016 WL 7223468 (W.D. Tenn. Dec. 13, 2016)........................................18, 25, 27

*Roberts v. Corr. Corp. of Am.*,
2015 WL 3905088 (M.D. Tenn. June 25, 2015).....................................................................20

*Robinson v. Empire Equity Group, Inc.*,
No. WDQ-09-1603, 2009 WL 4018560 (D. Md. Nov. 18, 2009) .........................................28

*Saleen v. Waste Mgmt., Inc.*,
CIV 08-4959(PJS/JJK), 2009 WL 1664451 (D. Minn. June 15, 2009), *aff'd*,
649 F. Supp. 2d 937 (D. Minn. 2009).....................................................................................23

*Simpson v. Caresouth Hha Holdings, LLC*,
2016 WL 3349637 (M.D. Tenn. June 16, 2016).................................................................20, 24

2

*Syed v. M-I, L.L.C.*,
 No. 1:12-CV-1718 AWI MJS, 2014 WL 6685966 (E.D. Cal. Nov. 26, 2014) ......................28

*Thompson v. Direct Gen. Consumer Products, Inc.*,
 3:12-CV-1093, 2014 WL 884494 (M.D. Tenn. Mar. 5, 2014) ................................................26

*Tracy v. Dean Witter Reynolds, Inc.*,
 185 F.R.D. 303 (D. Colo. 1998) ............................................................................................23

*Tyler v. Taco Bell Corp.*,
 2:15-cv-02084, 2016 WL 2344229 (W.D. Tenn. May 3, 2016)......................................18, 20

*Ware v. T-Mobile USA*,
 828 F. Supp. 2d 948 (M.D. Tenn. 2011).................................................................................20

**Statutes**

29 U.S.C. § 216(b) ............................................................................................................................17

# I. INTRODUCTION

Named-Plaintiffs Maya Crosby and Deneen Patton ("Named-Plaintiffs") seek to represent well in excess of 8,000 hourly employees in over 800 stores across the country based on their speculation that the time-shaving and off-the-clock practices they alleged occurred in the two stores where they worked in Tennessee. Named-Plaintiffs admit that they have no knowledge regarding whether employees' time-records in any other stores were inappropriately altered or whether employees in other stores worked off-the-clock. In support of their motion, Named-Plaintiffs have submitted declarations from ten other hourly employees who worked in six other stores whose testimony contradicts the Named-Plaintiffs' testimony in many significant respects. Notably, the Named-Plaintiffs and their declarants represent less than one percent of stores, less than .1 percent of the enormous putative collective Named-Plaintiffs seek to represent.

While Named-Plaintiffs claim that they were subjected to *de facto* policies condoning time-shaving and requiring off-the-clock work, they have not met their burden of establishing that these alleged *de facto* policies applied to the thousands of employees they seek to represent across of 800 stores. Rather, the record before the Court establishes that Specialty Retailers, Inc.[1] maintains lawful policies that strictly prohibit time-shaving or off-the-clock work, thoroughly investigates any alleged violations of these policies, disciplines any offending managers, and appropriately compensates any adversely affected employees, including Named-Plaintiff Crosby.

---

[1] Named-Plaintiffs and all others they purport to represent were not employed by Stage Stores, Inc., but were instead employed by Specialty Retailers, Inc. Specialty Retailers, Inc., owns and operates the stores where Plaintiffs and the proposed collective worked, and employs the employees in those stores (*see* Doc. 21, n. 1). For purposes of this Opposition, the employing entity, Specialty Retailers, Inc. is referred to as "Stage."

Based on the record before the Court, Named-Plaintiffs have failed to establish a common *unlawful* policy that violates the Fair Labor Standards Act ("FLSA"). Plaintiffs' motion seeking to represent a collective of thousands of hourly employees pursuant to Section 216(b) of the FLSA should be denied.

## II. PROCEDURAL POSTURE

On September 19, 2018, Plaintiffs filed a Motion for Court-Authorized Notice Pursuant to Section 216(b) of the Fair Labor Standards Act ("FLSA"), seeking to conditionally certify a collective action comprising:

> all persons who at any time from May 30, 2015 through the date of final judgment in this matter have worked as hourly, non-exempt employees whose titles included without limitation Sales Associates ("SA"), Visual Associates, eCommerce Fulfillment Associates, Custodian Freight Associates, Counter Managers, Cosmetic Sales Managers, Beauty Advisors, and Assistant Store Managers ("ASM") in Stage's United States locations that operate under the brand names Stage, Peebles, Goody's, Bealls, and Palais Royal.

(Doc. 30-1 ¶1; *see* Doc. 31 ["Plaintiffs' Motion"].) In addition to the Named-Plaintiffs, only seven other individuals have filed consents to join this action (the "Opt-in Plaintiffs"). (*See* Docs. 17, 26, 34, 36, 38, 41.)

## III. FACTUAL BACKGROUND

### A. <u>Stage Operates Over 800 Specialty Department Stores Nationwide.</u>

Stage operates over 800 specialty department stores in 42 states across the country under the name plates: Stage, Bealls, Peebles, Palais Royal, and Goody's. (Declaration of Tim Moyer ("Moyer Dec.") ¶ 2.) Stage divides its stores into five geographic regions. (*Id*.) Each region is overseen by a Regional Manager ("RM"). Each region is further divided geographically into 10 to 13 districts. (*Id*.) Every district is overseen by a District Manager ("DM"), who reports

Case 3:18-cv-00503   Document 42   Filed 10/10/18   Page 8 of 36 PageID #: 793

directly to the region's RM. Each district is assigned between 12 and 20 stores. (*Id.*) Every store is overseen by a Store Manager ("SM"), who reports directly to the district's DM. (*Id.*)

In addition to the SM, each store employs a number of hourly employees in a variety of positions. (*Id.* ¶ 3.) The vast majority of the hourly employees in Stage's retail stores work part time schedules. (*Id.*) Each store employs at least one Assistant Store Manager ("ASM") who is compensated on an hourly basis and who are eligible for overtime. (*Id.*) Each store also employs a number of associates in a variety of hourly, overtime eligible positions. Stage currently employs over 8,100 hourly employees in its over 800 retail locations. (*Id.*)

### B. **Stage's Time Clock Procedure.**

Stage's employees at its retail locations clock-in and out through a simple software program available to them through the sales registers located in the stores. (*Id.* ¶ 4.) Employees clock-in and out using a unique "Associate Number" they are assigned by Stage. (*Id.*) The registers and timekeeping software should be available to associates to use any time that they are in the store, regardless of whether the store is open for business. (*Id.*) Stage policy requires associates to "clock in/out properly and inform management of any corrections to time." (*Id.* at ¶¶ 4, 7, 14, Exs. A, H.) In December 2015, Stage reminded associates and managers of its timekeeping policy through a message that appeared whenever an associate or manager clocked-in at the register that specifically stated: "Associates are NEVER to work 'off-the-clock'. Associates are to be paid for all hours worked and any tasks performed." (*Id.* ¶ 5.)

### C. **Stage's Corporate Policies Explicitly Require Employees To Record All Time Worked And Strictly Prohibit Time-Shaving.**

#### 1. **Stage's Written Policies Require Employees To Record All Hours Worked.**

Stage's comprehensive employment policies explicitly require all non-exempt employees to accurately report all working time and warn that a failure to do so constitutes a terminable

offense. (*Id.* ¶¶ 5, 11-18, Ex. A, D, E, F, H-J.) Stages policies further prohibit all employees, from instructing or encouraging employees to work off-the-clock. (*Id.* ¶¶ 6, 10-18, Exs. D-F, H-J.) These policies are communicated to employees in a variety of ways, including through Stage's written policies (including Stage's Associate Handbook), daily updates and weekly planners, and written training materials. (*Id.* ¶¶ 5-6, 10-18, Exs. A, D-F, H-J.)

Stage's Associate Handbook states, in part, "The Company uses a clocking system for recording hours worked . . . To be sure that your time worked will be recorded accurately, always CLOCK IN AND OUT as instructed." (*Id.*, Ex. A.) The Handbook further provides, "[i]t is illegal to work off-the-clock and not receive compensation for all time worked." (*Id.*) The Handbook further instructs employees to "immediately inform your supervisor," if they make an error.[2] (*Id.*)

Stage's Store Policy and Procedure Manual (the "SPP Manual"), which SMs and ASMs are responsible for knowing, understanding, and enforcing, also memorializes Stage's timekeeping policies. (*Id.* ¶ 10, Ex. D.) The SPP Manual provides, in part, that "[i]t is the associate's responsibility to clock in and out properly and inform management of any corrections to time." (*Id.*, Ex. D.) The SPP Manual further provides that "[a]ll associates must be clocked in while performing company business for the location, i.e., making bank deposits, support help at other locations, new store openings, meetings, recruiting, or other store related errands." (*Id.*)

> ## 2. Stage Explicitly Prohibits Time-Shaving Or Any Other Falsification Of Time Records.

Stage's Code of Ethics and Business Conduct explicitly prohibits falsification of payroll records. (*Id.* ¶ 11, Exh. E.) The code further provides that anyone who violates this policy "may be subject to disciplinary action, up to and including termination . . ." (*Id.*, Ex. E.) All

---

[2] Named-Plaintiffs acknowledged receiving copies of the Associate Handbook. (*Id.* ¶¶ 8-9, Exs. B-C.)

employees are trained on Stage's Code of Ethics and Business Conduct at or around their time of hire. (*Id.* ¶ 11)

Stage's policy prohibiting time-shaving is further emphasized in training that all managers undergo. Since January 18, 2017, Stage SMs and ASMs are required to undergo a training entitled "Keeping Accurate Time Records." (*Id.* ¶ 12, Ex. F.) This training covers Stage's longstanding policies regarding timekeeping, including Stage's policy that explicitly prohibits time shaving. (*Id.* ¶ 12, Ex. F.) The training explicitly provides that "Managers must ensure that Associates' time punches accurately reflect the time Associates worked." (*Id.,* Ex. F.) The training further provides that

> The 2 situations in which a Manager must edit an Associate's time punches are the only legitimate reasons for editing time punches. In other words, a Manager may edit an Associate's time punches only:
>
> To correct an discrepancy between the time punch and the time that the Associate actually started or stopped working;
>
> To enter a forgotten time punch.

(*Id.*, Ex. F.) The training emphasizes that managers will face discipline, up to and including termination, for:

> Editing/changing an Associate's time without their knowledge;
>
> Editing/changing an Associate's time other than for a legitimate reason (to correct an error, and to enter a forgotten time punch);
>
> Entering the wrong time for any Associate, including themselves;
>
> Asking or allowing any Associate to work "off-the-clock" or without pay.

(*Id.*, Ex. F.) The training then walks through a number of "Examples of Improper Time Record Changes" and emphasizes that the consequences of improper alteration of time records is "termination." (*Id.*, Ex. F.) As of August 1, 2018, over 89 percent of Stage's SMs and ASMs

5

had completed this training and had acknowledged Stage's timekeeping policies at the conclusion of the training, including Named-Plaintiff Patton. (*Id.*¶ 13, Ex. G.)

In November 2017, in order to further enhance compliance with its timekeeping policies at the store level, Stage began requiring managers to complete a "Timekeeping Correction Form" each time they corrected a time punch in the timekeeping system. (*Id.* ¶ 14, Ex. H.) Managers are expected to ensure that employees sign off on any corrected time punches using this form. (*Id.*)

### 3. Stage Provides Multiple Avenues for Employees to Report Concerns Regarding Violations of Stage's Timekeeping Policies.

Stage employees may report concerns regarding potential violations of its timekeeping policies through a variety of means. First, the Associate Handbook provides that employees should immediately inform their supervisors about any timekeeping errors. (*Id.*, Ex. A.) Associates are also trained that they can report any timekeeping concerns to their DM or the Human Resources Business Partner. (*Id.*) Additionally, Stage maintains a Key Line for anonymous complaints that employees can use to report timekeeping concerns. (*Id.* ¶ 15.) Each paystub Stage employees receive provides that employees can "report suspicious activity or violations of company policy and remain anonymous" by calling the Key Line. (Patton Dep. Ex. 7.) The paystubs further provide that employees may direct any questions regarding their pay to HR and provides a 1-800 number for Human Resources. (*See id.*) Employees are also made aware of the Key Line and the Human Resources hotline through a variety of other means, including written postings in each store. (Moyer Decl. ¶ 15.)

### 4. Stage's Timekeeping Policies Are Consistently Reiterated In Daily and Weekly Communications Distributed to The Stores.

Along with its written policies, Stage also uses other means to communicate its timekeeping and off-the-lock policies. Stage's timekeeping policies are consistently discussed

and reiterated in daily and weekly communications that are sent to each store and that SMs and ASMs are expected to review and acknowledge.  (*Id.* ¶ 16, Exs. I-J.)  For example, the Daily Update for April 8, 2016 contains a section entitled "Important Reminder" which highlights Stage's policies prohibiting off-the-clock work.  (*Id.,* Ex. I.) These same points are also covered in the weekly update provided to the stores for the week of April 3, 2016.  (*Id.*, Ex. J.)

> **5.** **Stage Further Emphasizes Its Timekeeping Policies In Management Meetings and Trainings.**

Stage also implements its timekeeping and off-the-clock policies through verbal communications.  For example, Store Managers attend a weekly company-wide conference call during which Stage's timekeeping policies are routinely emphasized.  (*Id.* ¶ 18.)  The Company also has periodic district calls that DMs and RMs attend during which the company's timekeeping policies are emphasized.  For example, during an April 2017 conference call, Stage's policy prohibiting off-the-clock work was discussed and District and RMs were reminded that per the Associate Handbook, it is illegal for hourly paid Associates to work off-the-clock and not receive compensation for all time worked.  (*Id.*)  They were also reminded that they should ensure that managers understand that associates are not to work off-the-clock before or after their scheduled shift, even if cleaning up or completing tasks that should have been done during the shift.  (*Id.*)

> **D.** **Stage Diligently Investigates And Takes Appropriate Action In The Isolated Instances Where Off-The-Clock Work Or Time-Shaving Is Reported.**

Despite Stage's clear and consistent communication of its expectation that employees be paid for all hours worked and its strict prohibition of time-shaving, isolated incidents of manager misconduct have been investigated and remedied.  (*Id.* ¶ 19.)  Stage has investigated allegations of time-shaving or off-the-clock work in approximately 40 of its 800 stores since 2015.  (*Id.*)

7

Each investigation has been conducted by a Human Resources Manager with guidance from the Vice President of Human Resources for Stores. (*Id.*) At the outset of each investigation, the investigator speaks with the SM alleged to have engaged in time-shaving or in encouraging employees to work off-the-clock to ensure they understand Stage's policies. (*Id.* ¶ 20.) The investigator then interviews the complaining employee or employees. (*Id.*) The investigator then conducts a thorough and detailed review of the time records from the store in question to determine whether inappropriate changes have been made to employees' time records. (*Id.*) Stage's timekeeping system allows the investigator to see each employee's original time punches, any changes that were made to those punches, and who made those changes. (*Id.*)

If the investigation reveals that time has inappropriately been shaved from employees' time records or that employees have inappropriately worked off-the-clock, Stage calculates the amount of wages each employee should have been paid, including any unpaid overtime premium where applicable. (*Id.* ¶ 21.) Stage then sends a letter to each affected employee and former employee explaining that it has discovered the unpaid time, asking the employee to verify that he or she worked the time, and asking the employee whether they were not paid for any additional time. (*Id.*) Stage then compensates each affected employee for any unpaid time identified and investigates any additional allegations that arise through this process. (*Id.*) Stage terminates the employment of managers who it determines have engaged in time-shaving or who have encouraged or directed employees to work off the clock. (*Id.*)

One such investigation was initiated by Named-Plaintiff Crosby after she voluntarily ended her employment in November 2016. (Declaration of Velma Murphy ("Murphy Dec.")] ¶ 5.) In December 2016, Crosby reported to Human Resources Manager Velma Murphy that she

had shaved time from her and other employees' time records in the Hermitage, Tennessee store during a week that she was acting SM at her SM's instruction. (*Id.*) Murphy investigated these allegations and determined that Crosby had shaved 9 hours and 36 minutes of her working time as well as other employees' working time during the week that she was acting SM.[3] (*Id.* ¶ 6.) Stage paid Crosby for those 9 hours and 36 minutes and compensated the other affected employees' for the time Crosby shaved. (*Id.* ¶ 8.)

Murphy conducted a more in depth investigation into the timekeeping practices at the Hermitage, Tennessee store when a second employee complained about time-shaving issues beyond the week when Crosby was the acting SM. (*Id.* ¶ 7.) Murphy's investigation revealed that the SM at the Hermitage store had engaged in inappropriate time-shaving. (*Id.* ¶ 7.) Each affected employee and former employee, including Crosby, received a letter documenting the time that the SM had inappropriately shaved, and was invited to identify any additional time they believed that had worked, but had not been paid. (*Id.* ¶ 8.) Each employee, including Crosby, was then paid for any time for which they confirmed they were not paid. (*Id.*) The SM of the Hermitage store was terminated as a result of her violations of Stage's timekeeping policies. (*Id.*)

Although serious, the incidence of manager misconduct in directing employees to work off-the-clock or shaving time has been limited and isolated. Murphy has worked as Human Resources Manager for Stage since March 2015 and oversees a region of between 220 to 450 stores in not less than 13 states. (*Id.* ¶ 2.) She has received only five reports of violations of Stage's timekeeping policies, including the report made by Plaintiff Crosby that led to the

---

[3] While Crosby claims she shaved approximately 30 of her own work hours during this workweek, Murphy's review of the store's time records revealed that Crosby only removed 9 hours and 36 minutes from her time records that week. (Murphy Decl. ¶¶ 5-6.)

termination of Ms. Hoffman. (*Id.* ¶ 9.) Three reports (including Plaintiff Crosby's) were substantiated, one was unsubstantiated, and the fifth report is being investigated. (*Id.*) As a result of these reports, Stage paid all adversely-affected hourly employees for lost time, and terminated two SMs. (*Id.*)

    E.    **<u>Named-Plaintiffs Had Dramatically Different Experiences From Their Own Declarants.</u>**

    1.    **Maya Crosby**

In March 2014, Crosby was hired as a Sales Associate at a store in Winchester, Tennessee and held that position until approximately August 2014, when she was promoted to ASM and, later, to Counter Manager. (Crosby Dep. 11:12-20, 13:18-24, 14:11-17.) She later transferred to a store in Hermitage, Tennessee in or around November 2015 and was an ASM at that store until she voluntarily terminated her employment in November 2016. (Crosby Dep. 24:10-25.)

Crosby claims that she was not paid for several categories of time either because she worked those times off-the-clock or because her time records were inappropriately edited. She specifically claims she was not compensated for: interrupted meal breaks; time before and after her scheduled shifts; time spent covering other employees' shifts; time spent on a conference call; time spent working at home; time spent fielding phone calls or text messages from her SM; time spent on approximately two to four times days year when she would work until approximately 2:00 a.m. to 4:00 a.m. to help prepare for corporate visits;[4] and time that Crosby believes her Store Manager inappropriately entered as vacation time in order to avoid the hours hitting the store's labor budget.[5] Crosby claims she worked between 50 to 65 hours a week as an

---

[4] In her declaration, Crosby claims these visits occurred approximately ten times per year. (Doc. 32-12, ¶ 9.)
[5] Doc. 32-12, ¶¶ 7-8; Crosby Dep. 23:10-15, 28:20-29:18, 124:5-13, 128:10-129:4, 129:9-

ASM and 40 to 60 hours per week as a Counter Manager, but she cannot identify how many hours she worked in any particular workweek.  (Doc. 32-12, ¶ 9; Crosby Dep. 114:4-18, Ex. 2.)

Despite claiming to have worked an incredible amount of time off-the-clock, Crosby admits that she cannot identify any particular day, workweek, month or time of year when she worked off-the-clock or when her time was allegedly shaved for any of the reasons she claims, cannot identify the amount of time she spent working off-the-clock or that was shaved on any particular day or during any particular workweek, nor does she have any documents that would assist her in recalling such dates or times.[6]

Crosby claims that her Store Mangers instructed her not to clock-in and out based on the hours she actually worked, but to clock in and out based on her scheduled shifts.  (Doc. 32-12, ¶ 12; Crosby Dep. 99:12-100:11.) She claims she was specifically instructed to clock out and keep working on a weekly basis and that, during the holidays, she was required to arrive one hourly early and was instructed to work off-the-clock until her shift began.  (Doc. 32-13, ¶ 12; Crosby Dep. 196:17-197:2.)  Crosby further claims that the timekeeping system did not allow her to clock-in before the store opened or to clock-out after the SM shut down the main computer after the store closed.  (Doc. 32-12, ¶ 13; Crosby Dep. 30:21-31:22.)  She further claims that, when she was covering for SM Linda Hoffman while Hoffman was on vacation, Hoffman explicitly instructed her to shave time from employees' time records in order to ensure the store did not exceed its budget labor hours.  (Doc. 32-12, ¶ 17; Crosby Dep. 71:4-76:18.)   Crosby followed Hoffman's instruction and shaved time from her and her co-workers time records.  (Crosby Dep.

---

130:25, 143:17-144:19, 184:3-185:2, 190:1-191:11, 197:3-198:1, 198:12-200:1.
[6] Crosby Dep. 23:25-24:6, 25:1-21, 28:14-15, 30:7-9, 34:13-17; 37:5-15, 39:2-11, 42:25-43:6, 44:11-17, 47:17-48:6, 48:17-49:6, 49:16-21, 60:17-25, 62:23-63:16, 85:7-14, 106:11-2, 114:13-116:19, 124:5-13; 140:16-:141:20, 144:22-145:4, 148:4-14, 185:20-186:2, 189:14-25, 191:12-192:16, 193:10-194:6, Exs. 2, 5.

78:2-79:4.) Crosby admits that no one other than Hoffman ever instructed her to edit time records or to only clock in and out corresponding to her shifts. (*Id.* 87:10-18, 196:17-197:2.) Crosby further admits that she has no knowledge as to whether time-shaving or off-the-clock work occurred in any other store.[7]

### 2.    Deneen Patton

Patton was employed as an ASM from May 2015 to May 2017 in the Winchester, Tennessee store. (Doc. 32-13, ¶ 1; Patton Dep. 11:17-12:8.) Patton claims that she was not paid for several categories of time because she either worked off-the-clock or because her time records were inappropriately altered by her SM, including: meal breaks; time spent before her scheduled opening shifts; time spent covering other employees' shifts; and time spent working late nights three to four times per year[8] to prepare for corporate visits.[9] Patton claims she worked anywhere from 45 to 55 hours per week, but cannot identify how many hours she worked in any particular workweek. (Doc. 32-13, ¶ 7; Patton Dep. 89:14-91:3, 93:14-23, Ex. 7.) Like Crosby, Patton admits that she cannot identify any particular day or workweek when she worked any of this alleged off-the-clock work, cannot specify what hours she worked that she was not paid either due to the time being off-the-clock or due to inappropriate time record adjustments. (Patton Dep. 24:3-7, 57:10-15, 63:24-64:6, Ex. 2.) She further admits that there are no documents that would help refresh her recollection regarding the time she alleges she worked off-the-clock and that she did not keep her own records of the hours she worked.[10] In fact, Patton testified that she never even reviewed her pay stubs to determine whether she had been

---

[7] Crosby Dep. 88:1-25, 90:25-91:5, 122:2-8, 125:5-9, 126:5-9, 129:5-8, 131:4-10.
[8] Patton testified in her declaration that these late nights occurred 10 to 15 times per year and, later in her deposition, testified that "it would be more likely six to ten, maybe." (Patton Dep. 108:13-108:11.)
[9] Doc. 32-13, ¶¶ 5-6; Patton Dep. 18:15-25, 31:4-11, 32:6-1, 51:21-52:2, 54:24-55:7.)
[10] Patton Dep. 25:23-26:10, 57:16-58:4, 59:2-6, 63:24-64:6, Ex. 2, 89:14-91:3, Ex. 7.

paid for all of her hours worked. (Patton Dep. 92:17-93:13.) Rather, she based her speculative conclusions purely on the amount of money direct deposited into her bank account. (*Id*.) Patton alleges that her SM would specifically instruct her not to clock-in until her shift started, even though the SM knew she was working. (Doc. 32-13, ¶ 9; Patton Dep. 21:5-7.) However, unlike Crosby, Patton does not claim that the store's computer system prevented her from clocking-in on the days she came in early. (Patton Dep. 30:5-17.) She also does not allege that her SM characterized her work hours as vacation or sick time inappropriately. (*Id.* 92:7-16.) Patton also speculates that her time records were inappropriately altered by her SM. (Doc. 32-13, ¶ 13; Patton Dep. 34:16-23.) Patton never saw her SM alter time records, nor did she review her own time records to see if they had been inappropriately altered. (Patton Dep. 34:16-23.) Patton testified that she is unaware of any off-the-clock work or time-shaving at any store other than the store where she worked. (*Id.* 38:21-39:3, 76:14-77:4, 83:3-9, 101:17-22.)

### 3. The Opt-In Plaintiffs' and other Declarants' Testimony Reveals That Their Experiences Differ In Many Respects From That Of The Named-Plaintiffs.

In support of their Motion, Plaintiffs offer a total of ten declarations from individuals who have worked for Stage in hourly retail positions[11], in addition to the Name-Plaintiffs' depositions. (*See* Docs. 32-12 to 32-23.) These ten declarants describe their alleged experiences in three stores in Tennessee, including the stores where Named-Plaintiffs worked, a store in Rincon, Georgia, two stores in Texas, one store in New York and one store in Wisconsin.[12] In short, between the Named-Plaintiffs and these declarants, Plaintiffs have submitted testimony

---

[11] Three of these declarants, Devin Braunschweig (Doc. 32-21), Brittany Pevey (Doc. 32-22) and Jazmine Seegars (Doc. 32-23)) have not even filed consent to join this lawsuit.
[12] Docs. 32-14, ¶ 3; 32-15, ¶ 2; 32-16, ¶ 1; 32-17, ¶ 2; 32-18, ¶ 1; 32-19, ¶ 2; 32-20, ¶ 2; 32-21, ¶¶ 1-3; 32-22, ¶ 3; 32-23, ¶ 2.

regarding differing timekeeping practices in 8 stores (less than one percent of Stage's over 800 retail locations).

Plaintiffs' declarants' testimony differs from that of the Named-Plaintiffs' in many several respects:

- **Eight of Plaintiffs' declarants make no claim they were directed to work off-the-clock:** While both Crosby and Patton claim that their DM and SMs specifically directed them to work off-the-clock, only two other declarants, Anastacia Villarreal, who worked in the East Greenbush, New York store and Maria Lockwood, who worked in the Hermitage, Tennessee store, have testified that their SMs directed them to work off-the-clock. (*See* Docs. 32-14, ¶¶ 14-15, 18-19; 32-15, ¶¶ 10, 17.) The remaining eight declarants, including Lorie Hayes, who also worked at the Hermitage, Tennessee store, notably do not claim that they were instructed to work off-the-clock. (*See* Docs. 32-16 through 32-23.) In total, Plaintiffs have identified only one DM and three SMs, out of the hundreds of District and SMs nationwide, who allegedly instructed employees to work off-the-clock.

- **Five of Plaintiffs' declarants make no claim that work outside of their scheduled shifts was performed off-the-clock:** While Named-Plaintiffs both claim they performed off-the-clock work before or after their shifts began, only five of Plaintiffs' declarants claim the same. (*See* 32-14, ¶¶ 14-15, 32-16, ¶ 9; 32-20, ¶ 12, 32-22, ¶ 17, 32-23, ¶ 11.) The other five declarants make no claim that they performed pre-shift work off-the-clock. (*See* Docs. 32-15, 32-17, 32-18, 32-19, 32-21.)

- **Four of Plaintiffs' declarants make no claim that they performed off-the-clock work during meal periods:** While Crosby and Patton both claim they were not paid for interrupted meal breaks, the other declarations Plaintiffs submitted differ widely in their accounts regarding meal breaks. For example, one declarant asserts that, at her store in Duncanville, Texas, when employees did not clock out for meal periods, the SMs would alter time records to indicate the employees took meal periods. (Doc.32-16, ¶ 13.) Yet another declarant claims she took 30-minute meal breaks on Sundays, 60-minute meal breaks on Saturdays, and does not claim these meal periods were ever interrupted. (Doc. 32-17, ¶ 7.) Another declarant claims she was provided with 30-60 minute breaks. (Doc. 32-19 ¶ 7.) Four of Plaintiffs' declarants make no allegations of any off-the-clock work during meal periods. (*See* Docs. 32-17, 32-18, 32-21, 32-23.)

- **Seven of Plaintiffs' declarants make no claim they worked remotely answering calls or emails:** Unlike Named-Plaintiffs, seven of Plaintiffs' declarants do not claim that they performed any work outside of the store

14

performing tasks such as answering phone calls or responding to texts or emails. (*See* Docs. 32-15, 32-16, 32-17, 32-18, 32-19, 32-21, 32-22.)

F. **Named-Plaintiffs Admit They Had Dramatically Different Experiences From Stage's Declarants.**

Stage has submitted declarations from 25 ASMs who currently work in 25 stores located in Ohio, New Jersey, New York, Pennsylvania, and Texas, each of whom has testified that they: 1) are aware of Stage's policies prohibiting off-the-clock work and time-shaving; 2) have never been instructed to work off-the-clock by anyone at Stage; and 3) are unaware of anyone manager shaving time records.[13] The majority of these 25 declarants testified that they participated in the "Keeping Accurate Time Records" training described above in Section III.C.3, *supra*.[14] Clearly, these declarants' experiences differ greatly from that of the Named-Plaintiffs and Plaintiffs' other declarants.

---

[13] *See* Declaration of Chandler Campany ("Campany Dec.") ¶¶ 9-15; Declaration of Brenda Coleman ("Colman Dec.") ¶¶ 9-15; Declaration of Allison C. D'Angelo ("D'Angelo Dec.") ¶¶ 12-17; Declaration of Keith Fullerton ("Fullerton Dec.") ¶¶ 9-15; Declaration of Phillis Gibson ("Gibson Dec.") ¶¶ 9-13; Declaration of Amanda Gilbert ("Gilbert Dec.") ¶¶ 9-14; Declaration of Mary Heitzmann ("Heitzmann Dec.") ¶¶ 11-19; Declaration of Sharon Henderson ("Henderson Dec.") ¶¶ 9-15; Declaration of Heather Henry ("Henry Dec.") ¶¶ 12-15; Declaration of Ana Hiarmes ("Hiarmes Dec.") ¶¶ 9-15; Declaration of Cynthia Kalinowski ("Kalinowski Dec.") ¶¶ 10-17; Declaration of Tina Laird ("Laird Dec." ¶¶ 9-16); Declaration of Julie Macario ("Macario Dec.") ¶¶ 9-15; Declaration of Jessica Mader ("Mader Dec.") ¶¶ 9-15; Declaration of Jennifer Maruschak ("Maruschak Dec.") ¶¶ 10-17; Declaration of Kourtney McBride ("McBride Dec.") ¶¶ 9-15; Declaration of Kenneth O'Brien-Davis ("O'Brien-Davis Dec.") ¶¶ 9-15; Declaration of Iyesogie Osagie ("Osagie Dec.") ¶¶ 9-16; Declaration of Shohreh Poursharif ("Poursharif Dec.") ¶¶ 9-15; Declaration of Maria Roque ("Roque Dec.") ¶¶ 9-15; Declaration of Angela Shafer ("Shafer Dec.") ¶¶ 9-16; Declaration of Siobhan Smith ("Smith Dec.") ¶¶ 9-15; Declaration of Janice Stephenson ("Stephenson Dec.") ¶¶ 11-16; Declaration of Jill Stinson ("Stinson Dec.") ¶¶ 10-15; Declaration of Janet A. Weitkamp ("Weitkamp Dec.") ¶¶ 10-18.

[14] *See* Campany Dec. ¶ 11; Coleman Dec. ¶ 11; Fullerton Dec. ¶ 11; Gibson Dec. ¶ 11; Henderson Dec. ¶ 11; Henry Dec. ¶ 11; Hiarmes Dec. ¶ 11; Kalinowski Dec. ¶ 12; Laird Dec. ¶ 11; Macario Dec. ¶ 11; Mader Dec. ¶ 11; Maruschak Dec. ¶ 12; McBride Dec. ¶ 11; O'Brien-Davis Dec. ¶ 11; Poursharif Dec. ¶ 11; Roque Dec. ¶ 11; Shafer Dec. ¶ 12; Smith Dec. ¶ 11; Stephenson Dec. ¶ 13; Stinson Dec. ¶ 11.

When presented with the declaration of Ana Hiarmes, an ASM currently employed in Katy, Texas, Crosby admitted that her own experience differed greatly. Crosby specifically testified:

> Q: Paragraph 13 [of Hiarmes' declaration]: "No members of Stage's management, including any of my current or former Store Managers, had ever instructed me or encouraged me to perform any work off the clock or knowingly allowed me to work off the clock." Do you see that?
>
> A. Yes.
>
> Q. So it seems like in that regard she had a very different experience from you; would you agree.
>
> **A. Well, I'm glad she had a good Store Manager and District Manager, I guess. They followed the rules. I don't know.**

(Crosby Dep. 234:19-235:8 (emphasis added).) Crosby further testified:

> Q. Paragraph 14 [of Hiarmes' declaration], it says: I'm further unaware of any member of Stage's management, including any of my current or former District Managers or Store Managers, reducing nay other employee's (including any Assistant Store Manager's) reported work hours, encouraging or instructing any employees (including Assistant Store Manager) to work off the clock or knowingly allowing any other employees (including any Assistant Store Manager) to perform work off the clock." Do you see that?
>
> A. I do.
>
> Q. Okay. It seems like her experience in this regard is different than yours, would you agree.
>
> **A. We're two different people in two different places. I guess so.**

(Crosby Dep. 237:4-22 (emphasis added).)

Similarly, when presented with the declaration testimony from another Assistant Store Manager, Brenda Coleman, an ASM currently employed in Hillsboro, Ohio, Patton admitted her experience differed greatly. Patton specifically testified:

Q. But based on what [Coleman] stated here in writing, she says she's unaware of any adjusted time punch. That's different than your experience, isn't it?

A. It is different, yes, sir.

Q. Okay, She says in the last sentence there that: "I verify that my time sheet is correct each pay period and when I receive my paycheck, that I receive payment for all of the time that I reported on my timesheet." Is that something you did?

A. Absolutely not.

. . .

Q. If you take what's written here, it appears that you had a different experience than [Coleman] with respect to being instructed to work off the clock. Would you agree?

**A. Totally different experience.**

Q. Okay. She states that: "I have always recorded all of my work time and Stage has always paid me for all of my work time." Do you see that?

. . .

A. Yes, sir.

Q. Okay. That's different than you experience as well, isn't it.

A. Yes, sir.

(Patton Dep. 117:13-24, 118:25-119:8, 119:12:-15 (emphasis added).)

## IV.    LEGAL ANALYSIS

### A.    <u>Plaintiffs Must Make A "Modest Factual Showing" They Are "Similarly Situated" To Members Of The Proposed Collective With Respect To A Common Policy That Violates The FLSA.</u>

Plaintiffs seeking to pursue a collective action under the FLSA must demonstrate they are

"similarly situated" to members of the collective they seek to represent. *See* 29 U.S.C. § 216(b).

During the two-step analysis used in the Sixth Circuit, the court must first determine whether

notice of the pending action and opportunity to opt-in should be given to members of the

17

collective proposed by the plaintiffs. *See Monroe v. FTS USA, LLC*, 860 F.3d 389, 397 (6th Cir. 2017), *cert. denied*, 138 S.Ct. 980 (2018). This first step requires plaintiffs to make a "modest factual showing" that they are "similarly situated to members of the prospective class [they] seek to certify . . . ." *Redmond v. NPC International, Inc.*, 13-1037, 2016 WL 7223468, at *3 (W.D. Tenn. Dec. 13, 2016) (Breen, C.J.) (citations omitted).

Plaintiffs may make this modest factual showing by: (1) **identifying any common policy, practice or theory of injury that allegedly violates the FLSA *and* affects all members of the proposed class**; and then (2) **supporting their Motion with a factual nexus – something more than mere allegations**. *See O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 585 (6th Cir. 2009) *overruled in part on other grounds by Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016); *Peer v. Grayco Mgt. LLC*, 3:16-CV-01578, 2017 WL 2403269, at *3 (M.D. Tenn. June 2, 2017) (Crenshaw, Jr., C.J.); *Tyler v. Taco Bell Corp.*, 2:15-cv-02084, 2016 WL 2344229, at *3 (W.D. Tenn. May 3, 2016) (McCalla, J.) (plaintiffs must present some factual support for the existence of a class-wide policy or practice that violates the FLSA). While Plaintiffs' burden at this stage is modest, it is not "nonexistent." *See Peer*, 2017 WL 2403269, at *3

**B.**     **Plaintiffs Identify No Common Unlawful Policy Or Practice That Allegedly Affects All Members Of the Proposed Collective.**

**1.**     **Stage's Written Policies Unequivocally Prohibit Time-Shaving And Off-The-Clock Work.**

As described in great detail above, Stage's policies explicitly prohibit any member of management from shaving employees' time or encouraging, directing, or knowingly allowing employees to work off-the-clock. *See* Section III.C, *supra*. Stage's policies further prohibit employees from working off-the-clock and instruct them to record all of their hours worked. *See id.* These policies are memorialized in Stage's Associate Handbook, Code of Ethics, and Store Manual, among other places, are consistently emphasized in daily and weekly communications

18

and during mandatory timekeeping-specific training. *See id*. Stage investigates and enforces any alleged violations of these policies and terminates the employment of managers who are found to have violated these policies. *See* Section III.D., *supra*. In the face of this evidence, Plaintiffs have clearly failed to present a "moderate showing" that Stage's written common policies violate the FLSA.

**2.    Plaintiffs' Have Not Identified Any *De Facto* Policy Common To Them And The Putative Collective That Violates The FLSA.**

Because Stage's written policies and enforcement thereof clearly comply with the FLSA, Plaintiffs must present a theory that Stage maintains *de facto* common policy requiring or encouraging its stores to shave time and/or require, encourage or allow off-the-clock work. *See Gaffers v. Sitel Worldwide Corp.*, 2016 WL 3137726,*3 (M.D. Tenn. June 6, 2016) (denying conditional certification when plaintiffs did not present evidence of a common policy or practice to ignore the company's lawful written timekeeping policies). Plaintiffs' have not presented any evidence of such a common unlawful *de facto* policy, and their motion must be denied.

Numerous courts in this district have denied conditional certification based on similar evidentiary records similar to what is currently before this Court. In *Gaffers v. Sitel Worldwide Corp.*, Judge Todd J. Campbell denied the plaintiff's motion for conditional certification when the plaintiff failed to present evidence of a *de facto* common policy instituted by the defendant company to ignore its lawful written policies prohibiting off-the-clock work. *See* 2016 WL 3137726,*2 (W.D. Tenn. June 6, 2016). Judge Campbell specifically reasoned the plaintiff identified no common policy or practice because: (1) he alleged no directive from *defendant* to violate the existing written policies; (2) he did not allege that defendants' management instituted a *policy* or *practice* to ignore the written policies; and (3) he did not show he knew of the purported class members – "how they record their time, why, whether, or in what manner they

19

were required to work off-the-clock, or what specific policies or practices required other [employees] to not be paid for all work time." *Gaffers,* 2016 WL 3137726, at *3.

Similarly, this Court recently denied a motion for conditional certification where the plaintiff sought to conditionally certify 24 franchise McDonald's stores in Nashville but offered declarations based solely on his alleged experiences at only one of the restaurants. *See Peer*, 2017 WL 2403269, at *4. This Court reasoned that

> Plaintiff's declarations are based solely upon his alleged experiences at the Ruby Circle McDonald's, what he allegedly observed there, and what he allegedly was told by managers and co-workers at that restaurant. Nevertheless, he seeks conditional certification of all hourly employees at all 24 Grayco McDonald's in Nashville without any hint that those locations, too, engaged in the same sort of FLSA violations. The Court finds this insufficient, as a matter of law, to warrant conditional certification of the class that he seeks to represent.

*Id.* (citations omitted).[15]

---

[15] *See Medley v. Southern Health Partners, Inc.,* 1:17-cv-00003, 2017 WL 3485641 (M.D. Tenn. Aug. 8, 2017) (Trauger, J.) (denying plaintiff's motion to conditionally certify off-the-clock claim where plaintiff claimed she "personally knew" other employees who "were forced to work off-the-clock" or told to falsify time records but the plaintiff failed to identify the other employees); *Simpson v. Caresouth Hha Holdings, LLC*, 2016 WL 3349637, at *4 (M.D. Tenn. June 16, 2016) (Trauger, J.) (refusing to conditionally certify companywide class where plaintiffs worked only in Tennessee and declarations were not filed by employees from other locations); *Ware v. T-Mobile USA*, 828 F. Supp. 2d 948, 954 (M.D. Tenn. 2011) (Trauger, J.) (denying conditional certification of nationwide class where declarations were limited to employees of Nashville and Colorado Springs call centers); *Roberts v. Corr. Corp. of Am.*, 2015 WL 3905088, at *14 (M.D. Tenn. June 25, 2015) (Trauger, J.) (denying conditional certification of companywide class when all but one declaration was from an employee working in Tennessee); *Harper v. Lovett's Buffet, Inc.*, 185 F.R.D. 358, 363 (M.D. Ala. 1999) (observing that "[w]hile Plaintiffs have presented evidence that FLSA violations may exist with regard to certain hourly wage employees at Defendant's Dothan restaurant, there is a total dearth of factual support for Plaintiffs' allegations of widespread wrongdoing at Defendant's other restaurants"); *Tyler v. Taco Bell Corp.*, 2016 WL 2344229, *5 (W.D. Tenn. May 3, 2016) (denying company-wide conditional certification where plaintiff at her deposition disowned knowledge of practices outside of the two stores where she worked); *Pacheco v. Boar's Head Provisions Co., Inc.*, 671 F. Supp. 2d 957, 963 (W.D. Mich. 2009) (denying plaintiffs' motion for conditional certification of off-the-clock claim where there was "no evidence that supervisors were simultaneously trained, advised, or encouraged not to follow the written policy" prohibiting off-the-clock work).

20

Judge Campbell's reasoning in *Gaffers* and this Court's reasoning in *Peer* are directly on point in this case. As in *Gaffers* and *Peer*, Plaintiffs have not presented evidence that Stage's written policies violate the FLSA. Rather, Plaintiffs attempt to argue that they have presented evidence of a company-wide *de facto* policy condoning time-shaving and off-the-clock work in each store that violates Stage's written policies explicitly prohibiting such practices. However, Plaintiffs have only presented allegations of time-shaving and off-the-clock work from 12 employees, including Named-Plaintiffs, who worked in only 7 of Stage's over 800 stores to support these contentions.[16] *See* Section III.E, *supra*. As discussed above, there are significant differences among these 12 employees' accounts regarding their alleged experiences with time-shaving and off-the-clock work that illustrate that these employees were not subjected to uniform unlawful policies encouraging or requiring time-shaving or off-the-clock work. *See id.* And, of course, these 12 employees' accounts are completely contradicted by the 25 declarants who have submitted declarations in support of Stage's opposition to this motion, each of whom have testified that have not experienced any policy encouraging or requiring time-shaving or off-the-clock work. *See* Section III.F, *supra*. Named-Plaintiffs have admitted that they had "totally different experience(s)" from these declarants and have further admitted that they are completely unaware of the timekeeping practices in any stores beyond the specific stores where they worked. *See id.* Such evidence should lead this Court to adopt Judge Campbell's reasoning in *Gaffers*, follow its previous reasoning in Peer, and conclude that Plaintiffs have not presented evidence that Stage has instituted a *de facto* policy to ignore its lawful written policies. *See* 2016 WL 3137726, at *3.

---

[16] These employees worked in less than one percent of Stage's stores – an even smaller percentage than the Plaintiff in *Peer*, who worked in 1 of 24 stores at issue. *Peer*, 2017 WL 2403269, at *4.

21

### 3.     A Labor Budget Alone Is Not An *Unlawful* Policy Or Practice.

The only potentially "common" policy, practice, or theory Plaintiffs identify are the labor budgets Stage issues to each of its stores and expects its stores to meet.  But, a labor budget alone (which are commonly employed in the retail industry, as labor is one of the primary costs for a retail operation) without some uniformity in unlawful enforcement or "top down" directive to violate the FLSA, is not a common policy, practice or theory of ***injury*** that allegedly ***violates*** the FLSA.  *See Ahmed v. T.J. Maxx Corp.*, 10-CV-3609 ADS ETB, 2013 WL 2649544, at *10 (E.D.N.Y. Jun. 8, 2013) ("The Court **declines to hold that facially-lawful policies, which encourage store management to make productive use of employees' time or to report for work when scheduled, can form the equivalent of a 'common policy or plan that violate[s] the law,'** merely because they indirectly might encourage the minimization of overtime." [citations omitted; emphasis added]);  *Peer*, 2017 WL 2403269, at *3  (denying conditional certification where plaintiffs failed to provide a colorable basis for the existence of a company-wide policy).

To satisfy their burden for conditional certification, Plaintiffs must identify some common manner Stage enforced the labor budget to ***violate*** the FLSA and affect all members of the proposed collective. Plaintiffs have identified no common manner Stage enforced its labor budget to violate the FLSA and affect all class members. Instead, Plaintiffs and the putative collective were subject to strict policies prohibiting off-the-clock work and any violations of corporate policy are isolated instances involving only a few individuals.

At best, Plaintiffs' evidence suggests there are local managers acting outside of Stage's explicit direction that hourly employees must report all time worked and managers are not to alter time sheets except to correct errors.  When alleged off-the-clock work is due to the direction of individual rogue managers, not a nationwide policy or plan, conditional certification is not

warranted. *See Gaffers,* 2016 WL 3137726, at *3; *Holmes v. Kelly Services USA, LLC,* 16-CV-13164, 2017 WL 3381415, at *7 (E.D. Mich. Aug. 7, 2017) (denying conditional certification in part, because plaintiff "**failed to produce evidence that that any alleged non-payment for 'off-the-clock' work extended beyond one or two 'rogue' supervisors** and the team members who reported to them" [emphasis added]); *Caballero v. Kelly Servs., Inc.,* CV H-14-1828, 2015 WL 12732863, at *5-6 (S.D. Tex. Oct. 5, 2015) (denying conditional certification where "[a]t best, Plaintiffs' declarations attest to their interactions with **three supervisors who, in total, oversaw only seven employees out of the forty-six—member proposed class**" [emphasis added]); *Chalker v. Burlington Coat Factory of Florida, LLC,* 8:12–cv–2755–T–23TBM, 2013 WL 5954783, at *3 (M.D. Fla. Nov. 7, 2013) (denying conditional certification in part because "plaintiff has presented no evidence of a 'common scheme applied uniformly' .... To the contrary, plaintiff's evidence suggest[ed], at most, that **one or more SMs, acting independently and not in accord with a common policy (and in defiance of a stated policy) coerced some employees into working overtime without compensation**" [emphasis added]); *Tracy v. Dean Witter Reynolds, Inc.,* 185 F.R.D. 303, 311 (D. Colo. 1998) (although some managers subjected individuals to unpaid overtime, "that fact alone does not lead [one] to conclude that there must be some unlawful national policy out there somewhere"); *Braun v. Superior Indus. Int'l, Inc.,* 09-2560-JWL, 2010 WL 3879498, at *6 (D. Kan. Sept. 28, 2010) (denying nationwide certification because alleged policy was implemented by a handful of "rogue" supervisors); *Saleen v. Waste Mgmt., Inc.,* CIV 08-4959(PJS/JJK), 2009 WL 1664451, at *6 (D. Minn. June 15, 2009), *aff'd,* 649 F. Supp. 2d 937 (D. Minn. 2009) (denying conditional certification where plaintiffs' witnesses provided varying reasons they allegedly worked off-the-clock because "no single policy about that core issue from which a collective action can emanate").

Even under the most lenient standard for conditional certification, Plaintiffs must do more than simply state that Stage has a labor budget and therefore managers encourage off-the-clock work and/or shave employee time. *See Gaffers,* 2016 WL 3137726, at *3. Indeed, if this is all that is required, there would be no need for a Motion; in all cases the complaint filed would suffice. As one district court wisely noted, "[a] minimal burden should not be confused with a nonexistent burden." *Goodrich v. Covelli Famly Ltd. Partnership*, 8:11–cv–1715–T–33TBM, 2012 WL 1081473, at *3 (M.D. Fla. March 30, 2012) (denying conditional certification of an FLSA collective action). While the Court cannot resolve factual issues or make credibility determinations at this stage, Plaintiffs must at least *allege* a common, single, *illegal* policy which affects the *entire* collective proposed by Plaintiffs. *Gaffers,* 2016 WL 3137726, at *3. They have not.

Because Plaintiffs have not shown or even alleged that Stage has an identifiable common policy or plan that violates the FLSA as to the entire proposed collective or that Stage's employees have a common theory of injury under the FLSA, conditional certification is not appropriate. *Id.; see also Simpson v. Caresouth Hha Holdings, LLC*, 3:16-cv-79, 2016 WL 3349637 (M.D. Tenn. Jun. 16, 2016) (Trauger, J.).

### 4. The Cases Upon Which Plaintiffs' Rely Are Readily Distinguishable.

While Plaintiffs argue that courts routinely grant conditional certification "based on similar evidence to that before the Court, the cases cited in Plaintiffs' Motion do not support conditional certification here. (*See* Plaintiffs' Motion, p. 16.) For example, in *Penley v. NPC Int'l, Inc.*, 56 opt-in plaintiffs had filed consent to join and plaintiffs had submitted **40 declarations** from employee witnesses in **12 states** all alleging a uniform practice of not being paid for attending training and meetings the case by the time the plaintiffs filed their motion for conditional certification. 2016 WL 7228901, *5 (W.D. Tenn. Dec. 13, 2016) (Breen, C.J.).

24

Another case cited by Plaintiffs, *Redmond v. NPC Int'l, Inc.*, 2016 WL 7223468, (W.D. Tenn. Dec. 13, 2016) (Breen, C.J.) is a related case to *Penley*, in which the plaintiffs sought to represent a group comprising only customer service representatives alleging the same uniform off-the-clock work (attending training and meetings) alleged in *Penley*. The plaintiffs in *Redmond* were joined by 41 opt-in plaintiffs and offered 27 employee witness declarations from seven states. 2016 WL 7223468, *1. Here, Plaintiffs have only submitted 12 declarations alleging a wide variety of unlawful practices and seek to represent thousands of employees based on this disjointed allegations. Clearly, the plaintiffs in *Penley* and *Redmond* presented a much more uniform set of declarations representing a larger portion of the putative collective than Plaintiffs have presented here in order to meet their burden.

Another case cited by Plaintiffs, *Kutzback v. LMS Intellibound, LLC*, 301 F. Supp. 3d 807, 820 (W.D. Tenn. 2018) is also distinguishable. In *Kutzback*, conditional certification was granted after plaintiffs sought to represent "unloaders" who performed the same job and were paid on a production-based method that allegedly caused them to be paid less than minimum wage. *Id*. at 824 n. 1. Defendants moved to decertify the collective action, and the court granted decertification, in part. *Id*. at 822. The court permitted the opt-ins to proceed collectively on off-the-clock claims based on evidence that revolved around hand-held time-keeping devices which several managers admitted to using to manipulate employee time. *Id*. at 820. The court concluded that part-time employees and employees in different job positons or without off-the-clock claims were to be excluded from the collective action. *See id*. at 816-17, 822, 824. Here, the Plaintiffs seek to represent employees in at least eight positions based on vague and largely unsubstantiated allegations of time-shaving in only 7 of Stage's over 800 retail locations. Unlike

the plaintiffs in *Kutzback*, Plaintiffs have not presented evidence of a uniform practice of time-shaving related to any of the positions they seek to represent.

The only other decision from this jurisdiction that Plaintiffs cite is *Thompson v. Direct Gen. Consumer Products, Inc.*, 3:12-CV-1093, 2014 WL 884494 (M.D. Tenn. Mar. 5, 2014) (Sharp, J.). Plaintiffs in *Thompson* sought to represent insurance agents in more than a dozen states, and presented 10 declarations from agents who worked at several locations within four states. *Id.,* at *1, 3-5. Notably, the Honorable Judge Sharp **denied plaintiffs' request to conditionally certify a company-wide collective action** explaining that defendant "is right that Plaintiffs have submitted no evidence to support conditional certification across the company. . . . **while Plaintiffs contend that [defendant] admitted its insurance agents are subject to the same companywide policies, this admission pertains only to the company's written policy to comply with the FLSA.**" *Id.*, at *5-6 (emphasis added). The defendant asserted that various "entities" within each state retained authority over the insurance agents working under it. *Id.* Judge Sharp limited certification to only employees working under the same "entities" as Plaintiffs and their employee witnesses. *Id.* As in *Thompson*, the only uniform policy here is "to comply with the FLSA" and Named-Plaintiffs here admit that their experiences with alleged time-shaving and off-the-clock work differ greatly from other members of the putative collective they seek to represent. Under these circumstances, Plaintiffs fail to meet their burden of identifying a common policy, practice or theory of injury that allegedly violates the FLSA.

C.     <u>The Conflict Between Plaintiff Crosby And Members Of The Putative Collective Defeats Conditional Certification.</u>

Stage has no "top down" company-wide policy requiring off-the-clock work or time-shaving, and the alleged incidences of such discrepancies were perpetrated by only a few managers. To the extent any "policy" is alleged, it must be based on *ad hoc* directions from

management within a store. Plaintiff Crosby claims she shaved time off putative collective members' timesheets. (Doc. 32-12 ¶ 17; *see also* Doc. 32-17 ¶ 13.) Plaintiff Crosby's claim she implemented the alleged *ad hoc* policy being challenged creates a conflict that precludes collective treatment. Conditional certification is not warranted when managers alleged to require off-the-clock work are also members of the putative class. *See Ellerd v. County of Los Angeles*, CV 08-4289 CAS FFMX, 2009 WL 982077, at *5 (C.D. Cal. Apr. 9, 2009) (denying conditional certification where putative class members would have to show that other members "violated federal law and defendant's official policies by telling [them] not to record their overtime"); *Graves v. State of Colorado*, 31 Fed. R. Serv. 2d 1480 (D. Colo. 1980) ("a plaintiff who has participated in management decisions to be challenged by the class of nonsupervisory employees has interests that conflict, at least to some extent, with those members of the proposed class."); *see also, Redmond*, 2016 WL 7223468 (indicating that evidence the lead plaintiff in a collective action directed members of the putative collective to work off-the-clock may be ground for decertification).[17]

## V. PLAINTIFFS' PROPOSED NOTICE PROTOCOLS ARE OBJECTIONABLE AND PREMATURE

### A. Notice Should Only Issue To Individuals Going Back Three Years Back From The Date Of the Court's Order.

The language Plaintiffs' proposed notice incorrectly provides that notice will issue to individuals who worked for Stage going back three years from the date Named-Plaintiffs filed this lawsuit. However, the FLSA's statute of limitations continues on each putative collective member until he or she files notice of consent to join this lawsuit as a party plaintiff pursuant to 29 U.S.C. § 216(b). *See Kutzback v. LMS Intellibound, LLC*, 2:13–cv–2767–JTF–cgc, 2014 WL

---

[17] *See also generally, e.g., Masri v. Wakefield*, 106 F.R.D. 322 (D. Colo. 1984) (denying certification under Rule 23 where two-thirds of the putative class potentially had a cross-claim against other class members).

7187006 (W.D. Tenn. Dec. 16, 2014) (Claxton, Mag.).  Accordingly, notice should only issue to those individuals who worked for Stage during the three-year period preceding the Court's order and Plaintiffs' proposed notice should be revised accordingly.

**B.     Notice To Potential Class Members Should Be Handled By A Third-Party Administrator.**

A third-party administrator, not Plaintiffs' counsel, should provide any notice in this case to protect the integrity of the process and to protect the confidential information of potential opt-in plaintiffs.[18]  Providing the putative class list only to the third-party administrator will ensure that the notice process remains objective and avoids the potential for abuse or misleading communications to the putative collective members. Granting Plaintiffs access to contact information for all current and former employees creates the potential for the improper and unsupervised communications that the Supreme Court has warned against. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989) (noting potential for abuse in unsupervised communications between counsel and putative class members in a collective action).[19]  Third-party administrators routinely have data privacy and security protocols to protect confidential data in place.  Once the opt-in period has ended, the third-party administrator can provide Plaintiff's counsel with the confidential information of their new clients.  However, until that time, the data should reside solely with the third-party administrator.

---

[18] *See, e.g., Syed v. M-I, L.L.C.*, No. 1:12-CV-1718 AWI MJS, 2014 WL 6685966, at *8 (E.D. Cal. Nov. 26, 2014) ("Upon consideration, the concerns about privacy are significant. Plaintiffs['] counsel will not be given potential class members['] contact information; that data will be provided to the third party administrator only, who must take a more active role in this process."); *Robinson v. Empire Equity Group, Inc*., No. WDQ-09-1603, 2009 WL 4018560, at *5 (D. Md. Nov. 18, 2009) (holding that "[t]he [notice and notification] plan should include safeguards for the privacy of potential class members, such as a requirement that notices be mailed by a neutral third-party administrator.").

[19] *See also In re Lease Oil Antitrust Litig*, 186 F.R.D. 403, 441 (S.D. Tex. 1999) (finding that "unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts.").

### C. Plaintiffs' Requests For A Reminder Notice And A Notice With Paychecks Should Be Denied.

In addition to their request that notice be provided **first by mail** and **second by e-mail**; Plaintiffs also request that the Court permit Plaintiffs to send a **third reminder postcard** by mail and a **fourth reminder notice by email** "halfway through the notice period." (Doc. 31, p. 23.) Plaintiffs also request that Stage be required to include an **additional notice with employees' paychecks**. (*Id.*) The Court should reject Plaintiffs' request for excessive notices as unreasonable and unnecessary. *See e.g., Gunn v. NPC Int'l, In*c., No. 13-1035, 2016 WL 7223466, at *8 (W.D. Tenn. Dec. 13, 2016) (Breen, C.J.) (finding that attaching notice to employees' paychecks was duplicative and unnecessary); *Phipps v. Chariots of Hire, Inc*., No. 3:17-CV-97-TAV-HBG, 2017 WL 4228028, at *4-6 (E.D. Tenn. Aug. 29, 2017) (denying request to order that notice be enclosed with employee checks and denying request for reminder notice).[20] In rejecting request for reminder notices and requirement that defendant post notice to employees, the Honorable Judge C. Smith reasoned, **"the Court should be hesitant to authorize duplicative notice because it may unnecessarily 'stir up litigation' or improperly suggest the Court's endorsement of Plaintiff's claims."** *Fenley*, 170 F. Supp. 3d at 1074-75 (emphasis added); *accord Phipps*, 2017 WL 4228028, at *6.[21]

---

[20] *See also Fenley v. Wood Grp. Mustang, Inc.*, 170 F. Supp. 3d 1063, 1075 (S.D. Ohio) (denying plaintiffs' request to send reminder notices and to post notice at the defendant's place of business).

[21] It is also important to note that, since August 2018, a significant number of the putative collective have acknowledged Stage's Dispute Resolution Program and Mutual Arbitration Agreement ("ADR Agreement") in which employees waive their right to participate in an FLSA collective action against Stage and to instead submit any claims for violation of the FLSA to individual arbitration. Employees may opt-out of this program with no adverse effect on their employment. To date, a significant number of putative collective members have acknowledged the ADR Agreement. (*Id.* ¶ 4.) Any employee who has acknowledged Stage's ADR program has waived his or her right to participate in a collective or class action, such as this case. *See Epic Systems Corp. v. Lewis*, 138 S.Ct. 1612 (May 21, 2018) (holding that class action waivers in arbitration agreements must be enforced as written). Should the Court determine that notice of

## VI. CONCLUSION

Based on the arguments presented above, Plaintiffs' Motion should be denied.

Date:  October 10, 2018

Respectfully submitted,

*s/ John H. Lassetter*

John H. Lassetter (MN #0389009)
(admitted *pro hac vice*)
Lyndsey M. Marcelino (MN #0399757)
(admitted *pro hac vice*)
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402-2136
Telephone:  612.630.2136
jlassetter@littler.com
lmarcelino@littler.com

Roger D. Scruggs, Bar No. 29381
rscruggs@littler.com
LITTLER MENDELSON, P.C.
333 Commerce Street, Suite 1450
Nashville, TN  37201
Telephone: 615.383.3033
Facsimile: 615.383.3323

**ATTORNEYS FOR DEFENDANT**

FIRMWIDE:157048654.6 098440.1004

---

this lawsuit should issue to the alleged putative collective, those employees who have acknowledged Stage's ADR program should be excluded from the putative collective and should not receive notice.  A contrary decision would not serve judicial efficiency which is the stated purpose of the conditional certification process. *See Hoffman-La Roche*, 493 U.S. 165.

30